**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 16 2018   ★**JURY DEMAND**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LONG ISLAND OFFICE

MARTIN DEKOM,

           **Plaintiff**

**RECEIVED**

JUL 1 6 2018

        -against-

**EDNY PRO SE OFFICE**

**COMPLAINT**

GOLDMAN SACHS & CO. through its subsidiary MTGLQ Investors, L.P. AS OWNER OF "POOL 1", FANNIE MAE, BANK OF AMERICA N.A., NATIONSTAR MORTGAGE LLC, NASSAU COUNTY CLERK MAUREEN O'CONNELL, DOES 1-100

           **Defendants**

**CV-18  4078**

BIANCO, J.

I, Martin Dekom, *pro se* plaintiff, complain for damages, penalties, and other relief. For my complaint, with its exhibits and appendices, I allege and state as follows, under penalty of perjury:

**Jurisdiction and Venue**

LINDSAY, M.J.

1. This action is brought under the Racketeer Influenced and Corrupt Organizations Act (RICO) and is a Bivens action in civil rights.

2. Jurisdiction is by federal question, 28 USC 1331; Diversity- over $75k matter, Dekom (NY), Fannie Mae (DC), Bank of America (NC), Nationstar (TX), Nassau Clerk (NY), 28 USC 1332; and affecting regulation of commerce, 28 USC 1337.

3. Venue of Eastern District of New York is proper as the site of events, and is a place where defendants conduct their affairs.

**Parties**

4. Plaintiff Martin Dekom is a resident of New York.

5. Fannie Mae is the Federal National Mortgage Association, a corporation based in Washington, DC, a government sponsored enterprise, and an instrumentality of government policy, in Federal Housing Finance Agency conservatorship.

1

6. Nationstar Mortgage LLC (Nationstar) is a corporation based in Coppell, TX, a mortgage servicer, and an agent of Fannie Mae.

7. Bank of America, National Association (BofA), is a mortgage servicer, was at relevant times an agent of Fannie Mae.

8. "Pool #1" is the alias for the entity which claims ownership of a mortgage against the Dekom property at 34 High Street, Manhasset, NY., and is believed to be owned by Goldman Sachs & Co. through its subsidiary MTGLQ Investors, L.P., based on press release of Fannie Mae, see http://www.fanniemae.com/portal/media/financial-news/2017/non-performing-loan-sale-winner-6567.html . The real party in interest is Goldman Sachs.

9. Nassau County Clerk Maureen O'Connell is the county clerk of Nassau county and a resident.

10. DOES 1-100 are unnamed accomplices who took part in the racket to violate Dekom's rights.

## The Nature of the Case

11. The actions and incidents are more fully explained in the supporting Dekom Declaration, and also the Exhibits of case Dekom v Fannie Mae, 17-cv-2712, here incorporated by reference. Judicial notice applies to all actions referenced, as well as published documents, and public databases.

12. The racket harasses and coerces defendants into submission. Dekom was harassed and coerced, see Dekom Declaration and 17 cv 2712 exhibits.

13. Dekom was haled into a fraudulent court, which at the time he took to be legitimate. The fake hearing was orchestrated by Nassau Clerk Maureen O'Connell and accomplices. The result of this "foreclosure inquest" was a judgment of foreclosure obtained illegally.

14. "Foreclosure inquest" was created by a mix of public corruption and a cabal of mortgage industry insiders to serve as their private court. It does not exist in any law and is illegal.

15. The obvious benefit of this racket to Fannie Mae, its servicers, and their vendors is money. For the state actors, it is also money: every foreclosure generates a tangible financial benefit which is used as a patronage award to the politically connected. This is not a new theory (see "Investigation Shows Politicians Profit off Foreclosure Sales," WNYC News, at http://www.wnyc.org/story/299091-court-appointments-go-political-insiders/ ). This award can be used an illicit lottery ticket for tens of thousands of dollars. It is a known form of embezzlement.

16. Nassau county, known for corruption and patronage, has refined the process, in partnership with Fannie Mae, BofA, Nationstar, and their agents.

17. Dekom got rooked, so he appealed. He puzzled together all the legal weirdness and uncovered the fraud of "foreclosure inquest." This occurred in June 2016.

18. He also discovered collusion in the appellate court, which led to his discovery of a robosigning scam by unnamed accomplices.

19. In March 2016, Dekom got clobbered with an illegal second foreclosure lawsuit, while the first was still pending.

20. He discovered that the case was made to look real to him, but in fact was being kept out of the normal judicial process, by the Nassau County Clerk.

21. The Nassau Clerk's "secret docket" practice was recently exposed (see http://www.newsday.com/long-island/investigations/secret-docket-hides-court-cases-in-nassau-county-1.13177811 ).

22. This led to the discovery of another scam, that the Nassau County Clerk was illegally removing and altering public records, and influencing the selection of judges.

23. The facts show that the foreclosure process is fraught with illegality and is a substantive perversion of the law. The cases are fixed.

24. For instance, both Dekom's foreclosure cases still continue, although Dekom moved to dismiss twice, both times unopposed, and counterclaimed, also unopposed, and moved for default twice, also unopposed.

25. The case fixing scheme is designed to exploit *pro se* defendants, and provide illicit political patronage awards.

26. Fannie Mae put a bounty on the poor in foreclosure, paying a fat bonus if the matter is uncontested. However, whether or not a defendant contests an action is not within a plaintiff's control.

27. Based on the recent history of the industry, Fannie Mae knew that incentivizing servicers for a result they could not legally control would result in them achieving that end illegally, as proven here.

28. On information and belief, Fannie Mae uses other improper incentives which form an illicit bonus. After decades of foreclosures, the costs of an action in any jurisdiction can be calculated to the penny. However, the "Fannie Mae uniform instrument" used for mortgages to be insured by Fannie Mae stipulates that in the event of foreclosure, the borrower will pay an undefined amount of attorneys' fees and costs of litigation.

29. In effect, at closing the borrower is forced to agree to write a blank check in the event of foreclosure. This is unconscionable and the public policy eschews hidden fees.

30. Fannie Mae foreclosures are brought by the servicer. Fannie Mae reimburses the servicer for the hard costs (i.e., filing fee).Fannie Mae requires the servicer to repay them, if the foreclosure judgment awards them.

4

31. On information and belief, those recoveries are not being ultimately repatriated to Fannie Mae, they are retained by foreclosure law firms.

32. This acts as an illegal bonus which is based on that borrower's blank check. Predictably, they are subject to padding, at the borrowers' expense.

33. Fannie Mae's illicit bonus practice incentivized the violations here.

34. The financial crisis revealed the mortgage industry's heinous foreclosure practices. After billions in lawsuits, significant regulatory reforms, massive public outcry, and getting clubbed like a baby seal with repeated federal Consent Orders and a nationwide settlement, you'd think they'd learn.

35. Their recidivism becomes explainable, and predictable, with the revelation of Fannie Mae's illicit compensation schemes.

36. Fannie Mae's bounty and slush fund bonus provide a strong incentive for servicers to use their size to twist the arms of the poor, instead of conducting themselves like good corporate citizens. They are counter to public policy.

37. These schemes together form a racket as defined in statute, and the defendants are an enterprise. They aided the racket by inflicting extreme emotional distress, through coercion and intimidation. Dekom suffered these effects, and has suffered anxiety and humiliation.

38. Dekom's civil rights have been violated, including fundamental rights of Due Process, Equal Protection, and the right to petition, as a direct result of the racket, as well as actual losses.

39. The object of this action is to recompense Dekom for unlawful and illegal acts and prevent them from recurring.

**First Claim,** the defendants associated and acted in concert to form an ongoing enterprise, as defined, 18 U.S.C. § 1961(4). Its purpose was to effect a racketeering scheme in violation of the

Racketeering Influence Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d), as particularized in the Dekom Declaration, and all prior exhibits in 17 cv 2712. Alternatively, each member of the Double Recovery Enterprise constitutes a single entity "enterprise" of 18 U.S.C. § 1961(4), through which the members of the enterprise conducted a pattern of racketeering activity. The separate status of each member facilitated the fraudulent scheme and shielded the core scheme. At its core is the illicit double recovery of defaulted mortgage notes. The previously described fraud schemes, such as foreclosure surplus embezzlement, are sub-schemes which work alongside and in aid of the Double Recovery Enterprise.

## DAMAGES

40. The actions described inflicted actual damages upon Dekom, for which he asks recompense as follows:

41. His house has been rendered virtually unmarketable by defendants' continued false claims of liens against the property, diminishing the value of Dekom's assets by $600,000; and

42. His civil rights were violated, for which he seeks damages of $250,000 from each of the five defendants; and

43. He was deprived of his rightful share of the fee paid from the buyer of Pool 1, Goldman Sachs through its subsidiary MTGLQ Investors, L.P., to Fannie Mae. That amount, based on the cover bid of 80.24% of the UPB, of an alleged Dekom principal balance of $358,507.19, is $287,666; and

44. Wherefore, Dekom requests the sum of those three actual damages, being $2,137,666, trebled as provided by RICO to $6,412,998; and

45. Recompense for his emotional distress and humiliation by an unconscionable scheme, in an amount determined by the Court; and

46. punitive damages as the Court deems proper.

**Further relief**

And Wherefore, Dekom requests that further relief of any type which the Court deems perfection of justice.

Submitted,

16 July 2018

Martin Dekom
34 High St.
Manhasset, NY 11030
516 850-2717
Martin.dekom@gmail.com

GOLDMAN SACHS & CO. through its subsidiary MTGLQ Investors, L.P. AS OWNER OF "POOL 1"
200 West St
New York, NY 10282

Bank of America NA corporate headquarters
Bank of America Corporate Center
100 North Tryon Street
Charlotte, NC 28255

"Fannie Mae" Federal National Mortgage Association corporate headquarters
Federal National Mortgage Association
3900 Wisconsin Ave
Washington, DC 20016

Nationstar Mortgage LLC corporate headquarters
Nationstar Mortgage LLC
8950 Cypress Waters Blvd
Coppell, Texas 75019-4620

Nassau County Attorney for Nassau County Clerk Maureen O'Connell
1 West St
Mineola, NY 11501

**Dekom v Goldman, Dekom Declaration**

I, plaintiff Martin Dekom, state true under penalty of perjury:

Defendants Goldman Sachs and Fannie Mae engaged in an unlawful pattern of racketeering activity as defined in the Racketeer Influenced and Corrupt Organizations Act, in conspiracy and forming an enterprise with other defendants to execute it, as elaborated in this Dekom Declaration, and documented in the exhibits of 17 cv 2712, Dekom v Fannie Mae.


The racket is an illegal scheme of double recovery using "ghost Notes" which secures the assistance of accomplices through an elaborate series of kickbacks, favors, and assistance in illegal sub-schemes. It is described through my experience, from what I have been able to puzzle out in fact and inferences from those facts, and also facts widely known and commonly reported.

In the era leading up to the foreclosure crisis, the mortgage process worked like this: a lender like Countrywide would originate a mortgage which fit Fannie Mae's underwriting guidelines. The lender made representations and warrants to Fannie Mae that the loan did in fact qualify. Fannie Mae would then pool it with thousands of other mortgages and securitize it. The pool would be assigned an alphanumeric CUSIP and Pool/Trust number, and be sold to an investor. The investor was induced to pay close to the full amount of total of all the loans because of the Fannie Mae guarantee.

Ownership of the mortgage Note would be assigned to MERS, a shell corporation, so that the pool could be bought and sold without having to execute assignments with every transaction. A homeowner would make his monthly mortgage payment to a servicer, who acted as agent for the investor. The servicer would collect a fee and pass on the payment to the investor.

In a lawsuit over a contract, a party can only collect up to what it would have been paid under the contract. If an injured party is reimbursed by a collateral source, then the damages owed by the wrongdoer are lessened accordingly. If the injured party settles part of the debt, that, too, reduces the damages it can collect. Collecting more than what was owed under a contract is an impermissible double recovery. In short, the law's only priority is to make the injured party whole, and it does not concern itself with punishing the wrongdoer. This is contrast to tort law, in which an injured party can collect from multiple sources, like insurance, without any

reduction in the damages assigned to the wrongdoer. Tort law does not let a wrongdoer off the hook because of the moral hazard of doing so. Mortgages and foreclosure are actions in contract, not in tort.

The foreclosure crisis was in part caused because lenders' "reps and warrants" were often fraudulent. They lied to Fannie about the quality of the loans, meaning, that the borrower was actually not creditworthy. In many cases, the homeowner would default. As a result, the investor stopped receiving the flow of payments. Upon this default, the investor would execute the Fannie Mae guarantee and "put back" the loan to Fannie, and Fannie reimbursed the investor. The investor then had no injury and no loan.

Fannie then became the actual owner of the Note. There is no more need for MERS because the mortgage is no longer in the pool. The Truth In Lending Act requires changes in ownership to be recorded within 30 days. To recoup its cost, Fannie would then execute the "reps and warrants" agreement with the originating lender. The loan would be put back to the lender and Fannie reimbursed. Fannie would then have no injury, and no loan.

The originating lender would then become the actual owner of the Note, with an injury equal to the payment made to Fannie Mae, less any prior payments and settlements. To recoup its injury, it would then foreclose on the homeowner.

This is how the process works in theory, however, the foreclosure crisis resulted in significant distortions of this. Fannie Mae took advantage of the crisis to effect the largest theft in American history.

The foreclosure crisis caused a massive increase in put backs to Fannie Mae, crippling the enterprise. As a result, in 2008 Fannie made a deal with the US Treasury so it could survive. The US Treasury is an arm of the federal government, the sovereign of the American public. That public includes the thousands of mortgage borrowers, defaulters, and investors who rely on a stable financial market.

Treasury gave Fannie $200 billion to offset its losses and became 90% owner of a class of its preferred stock. This entitled the government to collect Fannie Mae's quarterly profits, known as the "quarter sweep." All of Fannie Mae's injuries from defaults were wiped out. Treasury said the $200 billion was not a loan, so at this point Fannie had no injury under contract law, which is the necessary basis for foreclosure.

Fannie Mae's losses from put backs continued. To prevent them from accumulating, it would draw "make whole" payments from Treasury to offset them. Here is a chart showing the extent of the draws through 2012:

http://www.businessinsider.com/chart-of-the-day-fannie-maes-draw-from-treasury-2012-5

The reimbursements from Treasury are not a loan or a debt, thus Fannie was reimbursed for every put back defaulted loan, leaving no injury. Having been made whole, it had no basis for foreclosure, and the defaulted mortgage Notes were paid in full. However, the borrowers were not notified that the loan was paid in full, and were left to believe they were still in debt. That paid-off debt became a "ghost note", meaning it is a debt which no longer actually exists, but is treated as a security.

Bank of America inherited Countrywide's woes, which included billions in reps and warrants put backs from Fannie Mae. Normally a lender reimburses Fannie for its loss and in exchange gets the Note. Then it recovers its loss through foreclosure. In 2013, Bank of America made a unique deal to settle its Countrywide liability to Fannie. It paid all of the current monies owed, however, Bank of America did not get the Notes back. Those were retained by Fannie Mae. For reference, see https://dealbreaker.com/2013/01/fannie-mae-and-bank-of-america-are-friends-again/

Fannie Mae did not give up ownership of the Notes because they were no longer valid. They had already been paid off. There is a common illegal practice in the mortgage industry known as "double pledging" or "double sale", in which a mortgage Note is sold to two different parties at the same time. By having Fannie Mae keep the Notes, Bank of America ran the risk of a reverse double-pledge, of being billed twice for the same Note. It had the notes cancelled.

Fannie Mae was now sitting on thousands of Ghost Notes. Technically it could not foreclose because the Notes had been paid off, now twice. However, the borrowers were unaware of this. Fannie Mae banked on the fact that because most foreclosure defendants do not show up for court, the paperwork deficiencies would not be an issue. With courts slammed with a backlog of foreclosure cases, judges would ignore those deficiencies.

Fannie Mae faced a difficulty because it was never entered as the Note owner of record. So it needed a frontman. In 2008, Nationstar was a minor player with significant problems. Fannie

3

made a secret deal with Nationstar in which a servicing division was created especially for Fannie but indistinguishable from the outside. Fannie had extensive control over it and had the right to buy out the division. Nationstar's book of business grew ten-fold. See https://asreport.americanbanker.com/news/how-fannie-propelled-nationstar-into-the-mortgage-stratosphere

Part of Bank of America's settlement with Fannie Mae was it had to transfer servicing to Nationstar. See https://www.appraisalinstitute.org/BankofAmericaFannieMaeAgreetoMultiBillionDollarSettlement/

Nationstar would not be held responsible for an improper foreclosure due to an inability to provide supporting documentation, see

https://www.sec.gov/Archives/edgar/data/1507951/000095012311010492/y04304a1exv10w3.htm

The government effectively controls compensation at Fannie Mae, which is also limited by the quarter sweep. This prevented people familiar with this deal from profiting from it. There has been a migration of Fannie Mae execs to Nationstar since this deal was struck.

The collection efforts of the Notes was facilitated by a series of changes of ownership which were not disclosed as required by TILA. For instance, 17 cv 2712 Exhibit ZZ (zz.1) shows a letter from Berkman Henoch alleging that the mortgage was owned by two limited partnerships, "BAC Home Loan Servicing LP" and "Countrywide Home Loan Servicing LP," neither of which appear in any assignment. As is now replete in this case and in the public record, the Countrywide loans with notes endorsed by Laurie Meder and Michele Sjolander were void due to multiple infirmities. This included that their signatures were forged by robosigning, that they were endorsed at an unknown time and place by parties unknown, and in an unknown order of endorsements.

Beginning in 2015, Fannie Mae pooled ghost notes and sold them. http://www.fanniemae.com/portal/funding-the-market/npl/index.html

The ghost notes had all been paid off twice, so whatever remainder interest there was belonged to the borrower, not to Fannie Mae. Fannie Mae included my interest in "Pool 1" which was

sold to Goldman Sachs & Co, through its subsidiary MTGLQ Investors, L.P. Neither Fannie Mae nor Goldman Sachs delivered those proceeds to me or any other borrower.

Goldman Sachs then resurrects the defaulted Notes by offering the homeowner a reduction in principal, without telling them the principal has been paid off. The reduction in principal amount is then used as a credit to the federal government to offset prior foreclosure related penalties.

Mail fraud was used to execute the racket and is a RICO predicate. Notices of various types were sent to me through the US mail alleging that I owed money on the mortgage at issue, despite there being no valid Note, and that it had been paid off twice. These mails were sent by Bank of America, Berkman Henoch, Fannie Mae, (see 17 cv 2712 Exhibit ZZ), including monthly "statements" sent by Bank of America and Nationstar continuing to this day. Legal papers furthering the racket also employed the US Mail (e.g., 17 cv 2712 exhibits N1.42, N1.49, N1.61). Nassau Clerk O'Connell also used the US Mail to further the racket, by using it to reject lawful papers and hobble my defenses (see Rejection of motion to dismiss, and of RJI and motions in Nationstar II exhibits in 17 cv 2712).

In Nassau county, NY, the racket has been facilitated by foreclosure law firms who are paid kickbacks by Fannie Mae. In addition to paying a standard fee for a foreclosure, Fannie Mae also paid them an extra amount if the defendant did not show. This bounty encouraged plaintiff attorneys to abrogate defendant rights and prevent them from appearing, or falsely portray them as not appearing.

Fannie Mae also permitted the plaintiff attorney to retain the "out of pocket" expenses which were fronted to them, while falsely presenting to the court that they were reimbursements to the client for its fees and costs. This is evidenced by the padding of those fees in foreclosure actions. There would be no need to do so if the funds were strictly passed through to the client as cost reimbursement.

Such costs and disbursements are presented after a case is won, by the winning side. Nassau County Clerk Maureen O'Connell aided the racket by receiving those presentations of costs during the case and approving them, establishing that the outcome was predetermined in the plaintiff's favor, by her. She physically altered the actual judgment to reflect this, entering data into the judgment itself and initialing it in such a way that it looked like a judge did it, and entering other data, such as the newspaper for publication and the referee. The statutory

process is for the costs to be presented to the clerk, the losing side notified, and then inserted into the judgment roll by physically attaching the paper with the detailed costs. The judgment served upon me had been poorly copied and shrunk from the original, disguising the alterations. An uninformed defendant, as I was, would not know that altering court records is a crime.

O'Connell further aided the racket by accepting documents into official court records that were unserved and without the official entry stamp, not entered in the minutes log, and not scanned as required. The commingling of official and unofficial documents altered the official record, violating my rights in the actions relying upon them.

The selection of the referee by O'Connell aided a foreclosure embezzlement scheme in which the surplus proceeds of a sale were not returned to the homeowner or escheated to the Nassau county Treasurer. This is based on the absence of a record of escheatments that would normally be visible and available.

Mark S. Ricciardi was frequently the referee selected by O'Connell. In the online public records kept by her as clerk, Ricciardi's name is misspelled 14 different ways, hiding his involvement in the racket. I could not find any record of him escheating where I would expect to.


O'Connell also directed the prohibition on filing cases poor, as the law allows, and also did not enter poor person motions in foreclosure cases, as the law requires. She directed that foreclosure plaintiffs are given special permission to file the summons and complaint apart from the RJI, in violation of law. She also maintains a secret docket, and obscures records from lawful viewing by not entering them into the system, triggering ecourts reporting. She personally receives and handles documents outside of the ordinary reception process. This results in creating false timestamps on documents which are significantly different from the submitted date, in violation of law.  She has prevented the filing of court papers. In furtherance of the scheme, she refused to obey the court order of July 2017 cancelling the lis pendens on my property (done in April 2018), and extinguishing the claims against it. This also damaged its marketability and my reputation, causing me humiliation and anxiety.

She personally selects judges in foreclosure matters, directing them to persons in collusion with her, who aid the fraud and rackets. This included, in my cases Thomas A. Adams, George

Peck who was in part motivated in service by the Nassau GOP, and the same in directing the case to Judge Parga, such that it could be disposed of by Elisabetta Coschignano, in his name.

I allege that the above illegal processes were systematically applied to me in furtherance of a pattern of racketeering activity.

In 2007 I got a loan from Countrywide. I believe that when I did, Countrywide had Fannie Mae securitize it, selling it off to an investor who bought it based upon Fannie's guarantee. This is based on common knowledge. In 2011, I defaulted. I speculate that the investor then "put back" the loan to Fannie Mae, which then became the actual owner of the Note. It directed a shell game of ownership changes which were not recorded as required by TILA. It notified Bank of America of its intention to put back the loan, and was part of the ensuing settlement. Fannie Mae was reimbursed for the Note a second time, by Bank of America. It retained the now paid-off "ghost note." It directed the transfer to Nationstar for the purpose of collecting on the Note a third time. These actions resulted in the violations detailed here and in exhibit.

The ghost Note did not belong to Fannie, it belonged to me. Fannie then aggregated it into "Pool 1", which was then sold to a subsidiary of Goldman Sachs. It terms this type of arrangement as "credit risk transfer." Goldman paid north of 80.25% of the UPB. Fannie did not forward those proceeds to me, nor did Goldman Sachs pay them to me. At no point did Fannie or any party show that to the extent the Note is valid, the amount due under it had been offset multiple times its par value. The Note's fatal deficiencies have been falsely kept from court records and from me, fraudulently misrepresenting the validity and amount of the debt. This includes false and doctored copies of the Note in every instance where it was presented, including most recently on June 26, 2018.

Submitted,

16 July 2018

Martin Dekom
34 High St.
Manhasset, NY 11030
516 850-2717
Martin.dekom@gmail.com